## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:

| | |
|---|---|
| Natural Pork Production II, LLP, | Case No.  12-02872-als11 |
| Debtor. | Chapter 11 |
| Natural Pork Production II, LLP, | Adv. Pro. 12-30098-als |
| Plaintiff, | |
| v. | |
| IC Committee, | |
| Defendant, | |
| Alan Axelrod, et al., | |
| Third Party Defendants. | |

## MEMORANDUM OF DECISION
### (date entered on docket: March 18, 2015)

Counsel in this matter are: Stanley J. Thompson and Mark D. Walz for the Plaintiff;

Rebecca A. Brommel on behalf of the IC Committee; Jay Casini for the third party defendants,

Lawrence and Doris Handlos; and Jonathan C. Miesen as counsel for Purina Mills, LLC,

successor-in-interest to PMI Agriculture, Inc.  A limited appearance was noted for the record at

the time of trial for T. Randall Wright on behalf of witness Steve Schmitz.  Trial in the above

adversary proceeding commenced on April 28, 2014.  Upon receiving testimony from the final

witness, and after consulting with the parties at a post-trial conference related to the exhibits, the

record was officially closed on May 29, 2014 and a briefing schedule was formulated.  The

matter is now fully submitted.  Jurisdiction of these matters is found at 28 U.S.C. sections

1

157(b)(1) and 1334.  Upon review of the evidence and the parties' briefs, the following findings

and conclusions of law are entered pursuant to Federal Rules of Bankruptcy Procedure 7052 and

9014.

## BACKGROUND

Natural Pork Production II, LLP ("NPPII" or "Partnership") was organized pursuant to a

Limited Liability Partnership Agreement ("PSA") dated July 10, 2002 to operate hog facilities.

There were four "Founding Partners":  Gary Weihs, Diane Weihs, Ron Beach, and Mona Jones.

Partners joining after the inception of NPPII were collectively referred to as "Contributing

Partners."  The PSA required all partners to make a capital contribution to the partnership, and in

some instances required partners to loan NPPII money, which resulted in a subordinated debt

under a form promissory note.  The PSA mandated that partners were also bound by a separate

Buy-Sell Agreement ("BSA") that spelled out the parties' rights and the procedures to be

followed upon the sale, transfer or other disposition of partnership units.

To promote interest in the partnership and obtain additional funds, NPPII engaged in

several private placement offerings pursuant to Confidential Offering Memorandums during the

time period of 2002-2006.  Qualified individuals could purchase new partnership units or simply

invest in NPPII by way of a subordinated promissory note.[1]  The Memorandums disclosed

various risk factors and included copies of NPPII's governing documents and a subordinated

promissory note form. Craton Capital LP (Craton) and Kruse Investment Company (Kruse)[2]

responded to one of these offerings which resulted in each of these entities purchasing over $1.7

million worth of units in NPPII in July 2006.

---

[1] Third party defendant Purina Mills, LLC holds no partnership units but invested in NPPII under the terms of a
subordinated promissory note.

[2] No legal relationship existed between these two entities, but at one time, Ejnar Knudsen served as Chief
Investment Officer for both Craton and Kruse and held investments or ownership in one or both of these entities.

NPPII began experiencing financial difficulties in 2007 which were primarily caused by escalating corn prices. In an effort to address this issue NPPII attempted to transition its business model from fixed price to variable contracts with its customers. About this same time, Craton and Kruse began to question their continued involvement in the Partnership. Ejnar Knudsen and Raju Shah, the respective principals of Craton and Kruse, initially had differing opinions, as to how to proceed. They agreed to wait and see how the market developed over the short term before making a final decision.

On March 28, 2008 Craton and Kruse submitted the required notification of their dissociation from NPPII pursuant to Iowa Code section 486A.602(a). According to the BSA this notification triggered NPPII's obligation to purchase and pay for the partnership units held by each of these entities. Shortly after receiving Craton and Kruse's dissociation notices[3], the Managing Partners declared an Impairment Circumstance[4] which would relieve NPPII of any immediate obligation to purchase units from Craton and Kruse. There were other partners that had also provided notice of dissociation prior to the date of the Impairment Circumstance that were entitled to their rights under the BSA. Collectively, this group is referred to as "pre-impairment dissociated partners." Of this group, Craton and Kruse were the most active in pursuing payment for the purchase of their units under the BSA.

At a Partner meeting conducted on April 4, 2008 a resolution was passed that authorized the Managing Partners[5] to undertake one or more "restructuring transactions" on behalf of NPPII. A letter dated April 14, 2008 was sent to NPPII's partners that outlined the issues and

---

[3] The parties had stipulated to the date the Impairment Circumstance was declared, but this was withdrawn at trial due to conflicting evidence. Although the actual date is uncertain, the Impairment Circumstance became effective sometime between April 4 and April 9, 2008.

[4] The BSA defines an Impairment Circumstance as a "finding or determination by the Managing Partners from time to time that any such purchase or payment would materially impair or otherwise adversely affect the working capital, cash flow or other financial means, condition or operation of the Partnership."

[5] Under the PSA, operation of NPPII was delegated to a group of no more than five Managing Partners who were required to hold partnership units to qualify for those positions.

obligations arising under the BSA.  It also stated that the Managing Partners "presently intend to proceed with an orderly disposition of the Partnership's Assets."  On May 28, 2008 another Partnership meeting was convened and the following actions were approved:  Gary Weihs was removed as a Managing Partner; partners that had dissociated were granted continued voting rights on partnership business; and the Managing Partners were no longer required to hold units and be partners of NPPII.  At the conclusion of this meeting there were three Managing Partners: Ron Beach, Steve Schmitz, and Wendell Burge.  Each of these individuals submitted their notice of dissociation from NPPII as follows:  Ron Beach, May 28, 2008; Steve Schmitz, May 29, 2008, Wendell Burge, October 22, 2008.  As of December 31, 2008 more than 80% of the partners of NPPII had dissociated.[6]

The Managing Partners took the position that the Impairment Circumstance prevented NPPII from purchasing units from any dissociated partner under the BSA.  Craton and Kruse disagreed with this determination and in 2009 filed litigation in state court seeking a declaratory judgment on two issues.  First, whether the Impairment Circumstance precluded NPPII from purchasing units as required under the BSA.  Second, what was the payment priority for the Partnership's liabilities.  On interlocutory appeal the Iowa Court of Appeals reversed the trial court by holding that the language of the BSA required NPPII to issue notes for the purchase of the pre-impairment dissociated partners' units. As a result of this ruling, NPPII issued notes to Craton and Kruse dated March 28, 2007.[7]

Gary Weihs developed many business interests that involved NPPII.  One such entity was Weihs Liquidity, which owned Nebraska Pork Marketing, which in turn owned Nebraska Pork. In 2009 Nebraska Pork Marketing made a capital call which NPPII did not meet.  Weihs

---

[6] Partners that dissociated after the declaration of the Impairment Circumstance are collectively referred to as "post-impairment" dissociated partners.
[7] This date is important because interest accrues from this date according to the terms of the BSA.

Liquidity then solicited interest from others to meet its cash needs.  Craton responded to this capital call and insisted the company name be changed.  An Amended and Restated Operating Agreement reflecting admission of Craton was adopted effective December 31, 2009.  The majority of Onyx Partners (formerly known as Weihs Liquidity) was owned by NPPII (85.19%). Craton owned almost 15% of the entity and two others held stakes of less than 4% each.  The members charged with management of Onyx were Beach, Burge, Schmitz and Knudsen.  In March 2011, a sale of Nebraska Pork was negotiated.  NPPII received a substantial sum from this sale on January 27, 2012.[8]

On April 3, 2012 a special meeting of the partners was called by Lawrence Handlos ("Handlos").  At that meeting, Beach and Schmitz were removed as Managing Partners.[9] Handlos was elected Managing Partner.  NPPII filed a voluntary chapter 11 petition on September 11, 2012.  This adversary proceeding began as a state court action filed by NPP in the Iowa District Court in and for Polk County Iowa which was removed by the ICC to the bankruptcy court on December 5, 2012.

## DISCUSSION

Before turning to allegations contained in the complaint and the specific legal arguments raised by the parties there are two evidentiary issues that must be resolved.  Admission of parol evidence and an offer of proof were reserved for determination and were the subject of post-trial briefing.

## I.      Post-trial evidentiary issues

Each party is convinced that their interpretation of the relevant documents will result in their success in this litigation.  But, to the extent there might be a question as to such an outcome,

---

[8] Payment of the sale proceeds was delayed due to a demand for additional fees related to the sale.
[9] The remaining Managing Partner, Wendell Burge, resigned shortly thereafter.

the parties ask the Court to permit extrinsic evidence to support their respective positions.  NPPII objects to the ICC's offer of certain exhibits and testimony that include interpretation of the term "Senior Liabilities" to be applied for purposes of payment priority.  (Exs. 154, 155, 155A, 156, 157, 158, 158A, 159, 159A, 182, 182A).  The ICC objects to the admission of NPPII's exhibits that contain "priority schedules" that were circulated to the partners arguing that these items are being offered to contradict the order of payment outlined in the PSA, BSA and the promissory notes.  (Exs. 8A, 24, 30, 164).

Integration clauses are contained in the PSA and BSA, and there is no evidence of other, or prior, agreements.  General principles of contract law do not permit evidence to be introduced to contradict the parties' clear expression contained in a written contract.  3 Arthur Linton Corbin, Corbin on Contracts § 573 (1960).  "The parol evidence rule is a substantive rule of law that prohibits the admission of evidence of prior or contemporaneous oral agreements, or prior written agreements, whose effect is to add to, vary, modify, or contradict the terms of a writing which the parties intend to be a final, complete, and exclusive statement of their agreement."  11 Williston on Contracts § 33:1 (4th ed.); see also Pitts v. Farm Bureau Life Ins. Co., 818 N.W.2d 91, 107 (Iowa 2012).  To be applicable, the "parol evidence rule presupposes that there is a valid and binding contract in force… [A]bsent fraud, mistake or accident, parol evidence is not admissible to vary, add to, or contradict the terms of a valid written instrument that is, on its face, complete and unambiguous."  1 Hon. Barry Russell, Bankruptcy Evidence Manual §9.1 (2012) (citations omitted).

"Extrinsic evidence to interpret contract language is only admissible to interpret the language actually used by the parties, and then only after an initial showing that the language is ambiguous."  Samide v. Titan Intern., Inc., 208 F.Supp.2d 1005, 1011 (S.D. Iowa 2002).  The

parties' disagreement as to meaning and application of the relevant contract language does not automatically result in a determination that a contract's language is ambiguous.  See In re Johnson, 355 B.R. 103 (Bankr. C.D. Ill. 2006).  Neither party has sufficiently established that the language contained in the BSA, PSA or the sub-debt notes is uncertain.  The extrinsic evidence identified by the parties are the opinions of the Managing Partners and attorneys regarding their interpretations of the contract.  Such evidence is not necessary for the Court to interpret the plain language contained in the relevant documents.  The parol evidence objections to Exhibits 8A, 24, 154, 155, 155A, 156, 157, 158, 158A, 159, 159A, 164, 182, 182A, and Wade Schut's testimony related to the definition of "Senior Liabilities" or subordinated debt involving these exhibits are sustained.   Exhibit 30[10] is admitted.   The content of that exhibit does not relate to the interpretation or application of the language contained in any of the documents at issue and therefore does not constitute parol evidence.

The post-trial order at docket number 328 reflects the reservation of an objection to Exhibit 256, the deposition of Wendell Burge.  No specific objection was noted to this item on the Second Amended and Substituted Joint Witness and Exhibit List filed at docket number 316. Exhibit 255 is the parties' stipulation as to Wendell Burge's testimony, an individual not called as a witness during the trial.  Based upon the admission of Exhibit 255, Exhibit 256 is not admitted.

During trial the Handloses requested an opportunity to submit an Offer of Proof for the admission of exhibits 262 and 263 which had been the subject of hearsay and lack of foundation objections by the ICC.  Upon review of the written argument and authority cited therein the ICC's objections which were previously sustained by the Court at trial are hereby modified.  The

---

[10] Duplicate of exhibit 124 to which there was also an objection.

Court's prior evidentiary ruling that excluded these exhibits at trial is vacated.  Exhibits 262 and 263 are admitted.

The complaint seeks declaratory relief on two matters.  First, whether the Settlement and Intercreditor Agreement is enforceable.  Second, the appropriate priority of payment between NPPII's creditors, including dissociated partners and sub-debt holders.[11]  Under Iowa law, NPPII bears the initial burden of proof in this action, the same as in any ordinary action at law or equity, even if a negative declaration is being sought.  Owens v. Brownlie, 610 N.W.2d 860, 866 (Iowa 2000).

## II.    The Settlement and Intercreditor Agreement ("SIA")

Central to the parties' disagreement is whether the SIA is valid and enforceable.  NPPII and Handlos allege that: the SIA and its terms impermissibly amended the PSA and BSA and therefore cannot be enforced; the SIA was outside the ordinary course of NPPII's business and the Managing Partners' authority; and the Managing Partners' conduct related to the SIA is a breach of their fiduciary duties.  The ICC asserts that the SIA is valid and enforceable because it constitutes a settlement and that the Managing Partners had full authority to enter into the agreement.

The BSA contains the following terms related to the purchase of dissociated partner units.

- Section 5.5 of the PSA allows a partner to dissociate from NPPII under Iowa Code section 486A.602(a) by giving notice[12] which constitutes a transfer event under Section 3.1 of the BSA that triggers application of its terms.  Once given, notice of dissociation cannot be revoked.

[11] There are a number of defendants that have not been actively involved in the litigation.  Many of these parties are subject to a stipulation in which they have agreed to be bound by the Court's decision in this action.   The docket reflects the entry of default judgments that have been entered against any remaining defendants that have failed to answer or participate in the litigation and did not agreed to the stipulation.
[12] Such dissociation is deemed "wrongful" under the IUPA section 486A.602(2)(b)(1) and PSA section 5.5.

- Section 3.4 of the BSA requires NPPII to purchase the units of a dissociated partner.  Calculation of the purchase price is based upon a formula contained in the BSA.

- NPPII can elect one of two methods under Section 6.3 of the BSA to pay the purchase price to a dissociated partner on the Settlement Date: 1) cash in full or 2) by a 20% payment of the purchase price with the balance paid by 60 equal installments under an unsecured promissory note issued on the settlement date.

- If an Impairment Circumstance is in place at the time of a partner's dissociation, NPPII was not required to purchase that partner's units under either option until 30 days after the Impairment Circumstance is lifted when notes would be issued and payment would be owing.

- If an Impairment Circumstance was declared during the time period when payments were due under a note issued to a dissociated partner any further payments were suspended until the Impairment Circumstance was lifted.

- Interest began to accrue from the date of the promissory note (Settlement Date) on a promissory note issued prior to the declaration on any Impairment Circumstance.  This interest would continue to accrue during any time period that payment was deferred due to an Impairment Circumstance.

- Within 30 days of the date an Impairment Circumstance is lifted, NPPII was to "recommence" payments on the notes issued prior to the declaration of the Impairment Circumstance.

- Within 30 days of the date an Impairment Circumstance is lifted NPPII is required to purchase the units of post-impairment dissociated partners through a cash payment or issuing a note dated as of this purchase.

On February 9, 2011 the Iowa Court of Appeals held that the BSA's language required NPPII to issue notes to Craton and Kruse as of the date of their dissociation.  The ruling noted that the BSA clearly contemplated different treatment for the purchase of Partnership units based

upon the timing of a partner's notice of dissociation as either *before* or *after* the declaration of an Impairment Circumstance. Craton Capital, LP, et al. v. Natural Pork Production II, L.L.P., 797 N.W. 2d 623 (Iowa Ct. App. 2011). As a result of this ruling, NPPII issued notes to Craton and Kruse dated March 28, 2008 with interest accruing from that date. Payment under those notes was deferred due to the Impairment Circumstance.

The issue of payment priority remained unresolved after the interlocutory appeal and was scheduled for trial in state court. A consensus developed among the Managing Partners that the disparate payment terms between pre-impairment dissociated partners and post-impairment dissociated partners was unfair and that Craton and Kruse were exploiting a "loop hole" to leverage a payment advantage. As a result of these conclusions a disagreement developed between Craton, Kruse and the Managing Partners about how dissociated partner notes must be paid.

On March 9, 2011 the sale of Nebraska Pork closed. The importance of this development was not lost on either the Managing Partners or Craton and Kruse. From NPPII's standpoint the continued need to remain under an Impairment Circumstance would be called into question upon receipt of the sale proceeds. Lifting the Impairment Circumstance would require NPPPII to make payment on the notes issued to pre-impairment dissociated partners. Craton and Kruse were concerned that NPPII might defer payment on the BSA notes in favor of other Partnership obligations if it controlled the sale proceeds without a resolution of the priority of payment issue. The combination of all of these factors prompted the Managing Partners and Craton and Kruse to attempt to resolve their differences.

Craton and Kruse wanted to improve their payment position under the BSA and the SIA provided this opportunity. A lien against NPPII's assets, compound interest, payments based

upon cash flow and strong default provisions were proposed.  The Managing Partners wanted payment of the post-impairment dissociated partners and pre-impairment dissociated partners to be pari-passu.  The negotiations extended over several months.  The result was a nineteen page SIA containing a number of conditions designed to satisfy Craton and Kruse's demands and the Managing Partners' desire to have all dissociated partners paid under identical terms.  The ICC was created to implement and oversee implementation of the SIA. The document was executed on November 30, 2011 just two weeks prior to trial on the payment priority issues scheduled in the state court action.

In order for the SIA to be binding, within 45 days after its execution, dissociated partners holding in aggregate at least 70% of the total balances owing for the purchase of units by NPPII must have affirmatively accepted and joined the SIA (collectively with Craton and Kruse the "SIA Parties").  The requisite goal was exceeded by December 23, 2011.  On this same date the Managing Partners lifted the Impairment Circumstance only as to SIA Parties.[13]  Then NPPII issued notes to the post-impairment dissociated partners that were SIA parties with a Settlement Date that matched the date of their notice of dissociation.  These notes were immediately surrendered and held in escrow.  NPPII then became obligated to each SIA party according to terms and conditions contained in the settlement under the administration of the ICC.

On January 27, 2012 NPPII received its share of the Nebraska Pork sale proceeds in the amount of $11,034,910.  On this same date NPPII remitted $10,509,341 to the SIA parties.

The ICC argues that the Managing Partners had the authority to enter into the SIA based upon the following Resolution, adopted by the partners on April 4, 2007.

> WHEREAS, it has been proposed that Natural Pork
> Production II, LLP, an Iowa limited liability partnership (the

---

[13] Presumably, any party that did not join the SIA would remain bound by the BSA and would not have received payment.

"Company"), undergo one or more restructuring transactions, pursuant to which the Company may: (a) form one or more subsidiary limited liability companies, which will be wholly owned by the Company (collectively, the "Subsidiaries"), and the Company will then transfer substantially all of its assets to such Subsidiaries, (b) sell selected facilities, retain selected facilities which will be leased to tenants under negotiated terms; (c) sell breeding stock and substantially all other assets; (d) sell the entire Company; (e) promulgate a Preferred Equity or Senior Convertible Subordinated Debt offering to recapitalize the Company (collectively, the "Restructuring Transaction") and

WHEREAS, the Managing Partners have approved the Restructuring Transaction and have recommended the approval of the same to the Partners.

NOW, THEREFORE, BE IT RESOLVED, that the Partners hereby approve the Restructuring Transaction, including the creation of the Subsidiaries, the purchase of membership interests of the Subsidiaries, the execution of the operating agreements and other organization document of the Subsidiaries, and the transfer of substantially all of the Company's assets to the Subsidiaries; and

RESOLVED, FURTHER, that the Partners hereby authorize any of the Managing Partners of the Company, including Ron Beach, to execute and deliver any and all agreements, contracts, certificates, documents and instruments, and to take such actions as may be necessary or appropriate to complete the Restructuring Transaction, and all actions taken in furtherance of the Restructuring Transaction are hereby ratified, approved and adopted as acts and deeds of the Company, and

RESOLVED, FURTHER that the Managing Partners are, and each of them hereby is, authorized, empowered and directed to take such actions and execute and deliver such documents as may be necessary or desirable to carry out the intents and purposes of the foregoing resolutions.

The ICC's emphasis on the Managing Partners' authority and complete discretion to take any action on behalf of NPPII under this Resolution is misplaced and overly broad.  This Resolution allowed the Managing Partners to undertake action to restructure NPPII which is defined as the liquidation of assets, realignment of the business operations and raising capital.

The Resolution does not address any liabilities of the partnership or how proceeds resulting from any of the potential restructuring transactions would be utilized or distributed.   While the Managing Partners had the authority to enter into any necessary agreement, contract, documents or instruments, such action was limited to one or more of the specified "Restructuring Transactions."   Of note is the fact that this Resolution was dated April 4, 2007, over a year before Craton and Kruse dissociated and two years before the state court action involving the purchase and payment for dissociated partner units was filed.   There is no basis to infer any intent or extend a grant of authority for unfettered discretion to resolve litigation on the issue of payment priority among partnership creditors.   At the time that Resolution was adopted such actions were not contemplated.   The ICC also contends that the law favors the enforcement of settlement agreements and that because the SIA settled protracted litigation and its associated costs it should be deemed valid and enforceable.   This position overlooks the fact that NPPII had no real dispute to settle with Craton and Kruse.   NPPII involved itself in the SIA for the sole benefit of the post-impairment dissociated partners.

While all of these arguments serve to justify the SIA they do not address the dispositive issue: Did the SIA require partner approval because it constituted an amendment to the BSA?

The parties agree that NPPII is subject to the provisions of the Iowa Uniform Partnership Act ("IUPA") codified at Iowa Code Chapter 486A which provides that the partnership agreement operates to define the rights and relationship between the partners.[14]   According to the PSA:

---

[14] Subject to the following exceptions:  that agreement cannot restrict a partner's right to access books and records, revise the mandatory fiduciary duties owing to partners and the partnership and cannot override other obligations arising under common law or statute.  Iowa Code §§  486A.103(2); 486A.104(1); 486A.410(11); Matthew G. Dore, 5 Ia. Prac., Business Organizations § 6:1.

*"The Managing Partners shall not take, or cause to be taken, any of the following acts or matters without the vote of the Partners* taken or otherwise obtained in accordance with Article VI of this Agreement:

(a)     the sale lease, exchange or other transfer or disposition of all or substantially all of the assets of the Partnership, other than by or pursuant to any mortgage, deed of trust, pledge, security interest or other form of security or collateral agreement, document, instrument or transaction;

(b)     the merger, consolidation or conversion of the partnership with or into another Person;

(c)     the dissolution of the Partnership;

(d)     *the amendment of this Agreement*; or

(e)     any act or matter for which the vote of the Partners is affirmatively and expressly required by the terms of this Agreement, the Iowa Act or applicable law.

(emphasis added).  Partners of NPPII are required to be bound by the BSA.  The PSA and BSA are fully integrated, therefore any amendments to the terms of either document can only be accomplished by partnership vote.

The Managing Partners did not follow the advice given to them to provide notice of the SIA to the remaining partners of NPPII.  Craton and Kruse were primarily concerned with insulating the SIA from a successful challenge by sub-debt holders. There was apparently much discussion, both formally and informally, related to the wisdom of dissociation.  Some partners believed it was better to end their partnership interest in NPPII.  Others subscribed to the belief that it might be better to "stay in" and enjoy an increase in equity if the markets improved.  The Managing Partners state that there was plenty of information available about whether to dissociate from the Partnership and that all anyone had to do was ask for it.  This statement does not serve to clarify what information would have been provided to a partner had such a request

been made.  The record is clear that the SIA was only circulated to dissociated partners.[15]   A conscious decision was made to not provide a copy of the SIA or disclose its terms to the remaining partners.

Most notably the following terms were contained in the SIA and differed substantially from the PSA and BSA:

- The purchase and payment distinctions between pre-impairment and post-impairment dissociated partners were eliminated.
- The requirement of the initial 20% down payment and payment by installment was eliminated.
- Retroactive interest from the date of dissociation was provided to post-impairment dissociated partners.
- The SIA notes were secured.
- Craton and Kruse received payment for a portion of their attorney fees.
- Any future Impairment Circumstance could not apply to payments made pursuant to the SIA.
- A committee ("ICC")[16] was formed to oversee the implementation of the SIA
- The priority and payment of all NPPII obligations were dictated by the terms of the SIA and by the ICC which could oversee the governance of the partnership and control whether to release working capital to NPPII.

Because they were not privy to the SIA, the partners had no opportunity to voice an opinion, let alone vote on the SIA.  A settlement cannot be used to circumvent application of the provisions contained in the PSA and BSA which bind NPPII and its partners.  The SIA effectively amended portions of the PSA and BSA without the required partner vote which renders its terms unenforceable.  As a result of this determination, it is not necessary to address the other grounds asserted by NPPII and the third party defendants to invalidate the SIA.

---

[15] In some instances it was provided to current partners that had only dissociated as to a portion of their units and still retained an interest in NPPII.
[16] Its members included Raju Shah, Ejnar Knudsen, Richard Ewing, Tom Jensen and Richard Lane.

## III.    Priority of Payment

Subordination agreements can be easily tailored to meet specific needs in order for a business to obtain additional loans or capital investments.  Subordinations can vary from partial subordination involving secured collateral to full subordination which is most often applied to insider obligations.  <u>See</u> 1 Com. Asset-Based Fin. § 8:42 (2014).  There has been an ongoing dispute as to the relative priority of payment between dissociated partners and sub-debt note holders.[17]  This same dispute continues in this action but with different parties.

The ICC contends that the subordination permits payment of the SIA parties ahead of sub-debt note holders.  NPPII along with other third party defendants, disagree and contend that dissociated partners can only receive payment after the sub-debt notes are satisfied.

According to Article I of the PSA a subordinated debt is evidenced by a "Subordinated Note" which is defined at Section 1.1(u) as:

> [A] promissory note in form and content and with such terms and conditions (including, without limitation, interest rate, principal and interest payment dates and intervals and final maturity date) as are determined by the Managing Partners from time to time, and under which, without limitation, the debt owed by the Partnership to the Partner in question may be subordinated in all or some circumstances to some or all of the bank and other financial institution debt of the Partnership and to all such other debts and obligation of the Partnership as determined by the Managing Partners.

The PSA further provides that any such notes were to be paid in "accordance with their terms" under Article VII, section 7.3.

---

[17] It is unclear why NPPII has been so invested in resolving this dispute.  "Although the borrower may be affected by the manner of resolution of certain issues between senior and junior creditors, the principal issues arising from subordination are just that--intercreditor issues. Agreement provisions dealing with subordination simply establish the ranking, or relative priority, of debt claims as against each other."  Com. Cont. Strategies Drafting & Negotiating § 16.05[A] (2015).

Two common circumstances existed that would give rise to a sub-debt note with NPPII. As a condition of joining the partnership the Managing Partners could require that a new partner lend NPPII money by way of a subordinated note. This same situation could also apply to existing partners that wished to obtain additional units. Whether to request such subordinated lending from a partner was within the discretion of the Managing Partners.[18] Subordinated notes could also arise from an investment in the partnership under one of the Offering Memorandums, which is the case with Purina. This entity holds a sub-debt note, but does not own any units in NPPII.

The term "Senior Liabilities" describes the subordination of debt repayment agreed to by the note holder and its definition is identical in all the sub-debt notes issued by NPPII.

> The term "Senior Liabilities" for purposes of this Note shall mean: (i) *any and all duties, liabilities and obligations of Borrower[19] from time to time, whether of payment, performance or otherwise to any third party whatsoever, including, without limitation, any and all duties, liabilities and obligations of Borrower to any and all Banks and trade creditors*; and (ii) all liabilities and obligations of Borrower under all Distribution Notes and Operating Notes (as hereafter defined); and (iii) all liabilities and obligations of Borrower under all other Company notes (as hereafter defined) that are entitled to priority in payment over payment of this Note as determined by Borrower's records.

The emphasized language is at issue in this case.[20]

Testimony regarding the priority of payment was provided from two sources. First, from the Managing Partners who eventually reached the conclusion that the purchase of units from dissociated partners must be made before payment on sub-debt notes. Second, from the principals of Craton and Kruse who expressed their view that subordinated debt could only be

---

[18] Such discretion was exercised to excuse Craton and Kruse from this condition. Neither of these entities holds any subordinated debt instruments with NPPII.

[19] NPPII is defined as the Borrower.

[20] The parties have not argued that the sub-debt notes or the notes issued under the BSA constitute Distribution, Operating or Company Notes. Upon reviewing the defined terms the Court concludes that subordination to Distribution, Operating or Company notes are not relevant to the outcome of the priority determination in this declaratory judgment action.

paid after all other obligations of NPPII have been satisfied.  Standing alone these opinions are neither relevant nor dispositive of the issue.  "[T]o say debt is 'subordinated' is almost meaningless; *the terms of subordination are critical to understanding the degree of subordination.*"   17 Equity Finance: Venture Capital, Buyouts, Restructurings and Reorganizations §17.24 (2015) (quoting, Coleman & Hollingsworth, *Subordinated Debt, in* Structuring Leveraged Buyouts: Defensive Recapitalizations and Other Acquisition Techniques 73 (Grey & Spatt, Co-Chairmen, 1988) (emphasis added).

Interpretation of the sub-debt notes begins with the "particular words or clauses found in [the] contract, and the contract as a whole regardless of whether the parties' writing is clear or ambiguous" in order to determine the parties' intent.  <u>See</u> 11 Williston on Contracts § 32:1 (4th ed.) (2014).  "[F]rom the words chosen, a court must determine "what meanings are reasonably possible" and "whether a disputed term is ambiguous."  <u>Walsh v. Nelson,</u> 622 N.W.2d 499, 503 (Iowa 2001).  Ambiguity arises when a term is subject to uncertainty, doubt or more than one meaning.  <u>See</u> <u>Berryhill v. Hatt</u>, 428 N.W.2d 647, 654 (Iowa 1988); <u>Gendler Stone Prod. Co. v. Laub</u>, 179 N.W.2d 628, 631 (Iowa 1970).  A word or phrase is not rendered ambiguous simply because the parties disagree as to its meaning.  <u>Walsh v. Nelson</u>, 622 N.W.2d at 503 (citing <u>Hartig Drug Co. v. Hartig</u>, 602 N.W.2d 794, 797 (Iowa 1999)).  "The test for ambiguity is an objective one: 'Is the language fairly susceptible to two interpretations?'"  <u>Iowa Fuel and Minerals, Inc. v. Iowa State Board of Regents</u>, 471 N.W.2d 859, 863 (Iowa 1991) (quoting <u>Central Bearings Co. v. Wolverine Ins. Co.</u>, 179 N.W.2d 443, 445 (Iowa 1970)).  Under Iowa law, the parties' intent is critical to a contract's interpretation.  "[I]ntent may be determined from the terms of the [contract], what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the [contract]."  <u>Rambo Associates, Inc. v. South</u>

18

<u>Tama County Community School Dist.</u>, 414 F.Supp.2d 887, 897 (N.D. Iowa 2006) (rev'd in part

on other grounds) (internal citations and quotations omitted).  The Court applies the following

standards in its examination of the Senior Liabilities clause contained in the sub-debt notes:  1)

the language used will be given meaning that does not result in an unreasonable or unlawful

application; 2) specific terms will govern general terms involving a particular issue; and 3) words

and phrases will be given their ordinary meaning in context, not in isolation.  <u>See</u> <u>Westlake</u>

<u>Investments, L.L.C. v. MLP Management, L.L.C.</u>, No. 4:09-cv-00095-JAJ-RAW, 2010 WL

7361159, at *5 (S.D. Iowa Mar. 3, 2010); <u>Iowa Fuel and Minerals, Inc. v. Iowa State Board of</u>

<u>Regents</u>, 471 N.W.2d at 863.

Holders of sub-debt notes cannot be paid ahead of Banks or trade creditors.  The term

"Bank" is defined in the sub-debt note as:

> any banking institution, trust company, insurance company or
> other institution of whatever type or nature engaged in the business
> of making loans for commercial purposes, or any third party who
> or which makes a loan or advances credit to Borrower on payment
> terms of more than ninety (90) days.  The term "Bank" shall not in
> any event, however, include any partner of Borrower.

The ICC did not directly argue that the notes issued under the BSA constituted Bank loans.  In

fact, the transaction involving the dissociated partners was solely an exchange of their equity for

debt which involved no funds being advanced to NPPII.  While it might be possible to fashion an

argument that the dissociated partner debt was an extension of credit, such an interpretation

would fall outside the ordinary and usual construction of the term "Bank" as used in the context

of the sub-debt note.  The BSA notes do not qualify for priority as "Bank" debt.  No argument is

made that any of the BSA notes constitute "trade debt."  Although this term is not specifically

defined in the sub-debt note, there is no reason to construe it in any manner other than in its

ordinary and common usage:  an obligation owing to an entity that provided goods or services to

NPPII.  Clearly, the notes issued to dissociated partners are not trade debt and cannot obtain priority in payment based upon that status.

The core of the parties' priority dispute turns on the undefined phrase "to any third party whatsoever" that is contained in the sub-debt note.  The wording of the Senior Liabilities clause uses the specific terms "Bank" and "trade creditors" to modify the general description of "any third party whatsoever."  When examining a contract, specific language is preferred over general language regarding a specific issue.  Iowa Fuel and Minerals, Inc. v. Iowa State Board of Regents, 471 N.W.2d at 863.  Application of this rule supports a determination that a third party must qualify as a Bank or trade creditor in order to obtain payment priority.  Black's Law Dictionary defines a third party as:  Someone who is not a party to a lawsuit, agreement, or other transaction but who is usu. somehow implicated in it; someone other than the principal parties. — Also termed *outside party* . . ."  (10th ed. 2014).  Based upon this dictionary definition there is no ambiguity as to the meaning of this term at the time the contract was drafted.  A "third party" is an individual or entity that is something other than a principal party which in this case would include NPPII, its partners and sub-debt note holders.

The ICC contends that the BSA note holders are no longer partners and a broad application of the phrase "any third party whatsoever" must logically result in payment of their notes ahead of sub-debt.  This line of reasoning is part of a continuing pattern in this case.  A series of calculated actions were undertaken in the form of resolutions and under the SIA which served as the means to accomplish the twin goals of allowing dissociated partners to retain certain rights as partners and to prefer payment to the BSA noteholders.  In furtherance of these efforts the dissociated partners describe themselves as partners when it suits their needs, but reject such a classification when it does not.  A note under the BSA can only be given to a

20

"partner," albeit one that has dissociated.  A BSA note holder can only be described as a former partner that is now a creditor of NPPII for the purchase of partnership units which is something very different from being a "third party" to a business transaction.  To overlook this fact would elevate form over substance and lead to an absurd result under the subordination agreement which is to be avoided.  Great Plains Real Estate Dev., LLC v. Union Central Life Ins. Co., 536 F.3d 939, 946 (8th Cir. 2008); Kaydon Acquisition Corp. v. Custom Mfg., Inc., 301 F.Supp.2d 945, 967 (N.D. Iowa 2004).

In further support of its position that dissociated partner debt has priority over sub-debt the ICC points to language in the note which states that NPPII had absolute discretion to enter into any Senior Liabilities.  The ICC contends that this language allowed the Managing Partners to designate the BSA notes at a higher priority than sub-debt notes. This argument is not persuasive.  As a general proposition, subordination can only be obtained with the knowledge of the creditor who has consented to its treatment as a junior debt holder according to the payment priority that is contained in the agreement or its note.  While NPPII had the ability to enter into additional "Senior Liabilities" it was bound by the definition contained in the sub-debt note. There is no authority cited that would permit NPPII or its Managing Partners to expand the classification of debts beyond those defined as "Senior Liabilities."  Under Iowa law, "a contract will not be interpreted giving discretion to one party in a manner which would put one party at the mercy of another, unless the contract clearly requires such an interpretation."  Id.  To adopt the position urged by the ICC would clearly violate this tenant and render the subordination agreement meaningless.

To the extent the phrase "any third party whatsoever" might be ambiguous the governing documents provide insight as to the parties' intent related to the priority of payment issue.

Payment for partnership units is specifically governed and addressed by the PSA at Article VII, section 7.5 as follows:

> No Demand of Partner Capital.  A Partner shall not be entitled to demand or receive from the Partnership the liquidation of the Partner's Units until the Partnership is dissolved in accordance with this Agreement, except only as may be otherwise expressly provided in the Buy-Sell Agreement.

According to the PSA, a partner may only demand repayment of capital as provided for under the BSA, which has been fully discussed in the prior section of this ruling and will not be repeated here.   Article VII of the BSA recognizes that the payment for the purchase of partnership units under the BSA is subject to any restrictions or conditions of applicable law "and/or any agreements, documents or *instruments* to which the Partnership is from time to time a party . . ."  The sub-debt notes are instruments to which NPPII is a party.  Payment under the BSA notes is "subject to" prior sub-debt notes.

The third party defendants argue that because dissociation is wrongful under the IUPA and the partnership's governing documents the notes issued to the dissociated partners should be paid after sub-debt note holders.   They claim that to do otherwise amounts to rewarding bad behavior.   Standing alone this contention is without merit.   The language used in all of the relevant documents does not suggest that such a priority was ever contemplated.   The word wrongful in this context does not rise to the level of condoning or permitting an illegal act under the PSA, BSA or sub-debt notes.   The IUPA provides a mechanism to address wrongful dissociation by the imposition of damages under Iowa Code section 486A.602.   Any damages awarded may be deducted from the amounts owed to a dissociated partner.   This remedy, not adjustment in payment priority, is the remedy for wrongful dissociation.

A review of the form note issued to the dissociated partners under the BSA contains no defined terms and is silent on the priority of payment. The sub-debt notes do not contain a provision that would allow preferred payment to BSA note holders. There is also no language to support a conclusion that dissociated partners must be paid last. In the absence of specific language such a priority designation cannot be read into the sub-debt note, especially when NPPII had the ability to address such obligations but apparently elected not to do so. The amounts owing by NPPII under the BSA notes held by dissociated partners and the sub-debt note holders are simply unsecured obligations with equal priority.

For the reasons stated herein, it is HEREBY ORDERED

1.     The terms of the SIA are invalid and unenforceable.

2.     Bank debt, trade creditors, Operating Notes, Distribution Notes and Company Notes are Senior Liabilities that have priority over payment of sub-debt notes and notes issued under the BSA to dissociated partners.

3.     The notes issued under the BSA to dissociated partners and the sub-debt notes are of equal priority for payment.

4.     Judgment shall enter accordingly.


/s/ Anita L. Shodeen
Anita L. Shodeen
Chief Bankruptcy Judge


Parties receiving this order from the Clerk of Court:
☒ Electronic Filers in this Adversary Proceeding

23